IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE

LARRY PIFER and PAMELA PIFER,
Husband and Wife,

                      Plaintiffs,

        vs.

BANK OF AMERICA, N.A., a national
association, SPECIALIZED LOAN
SERVICING LLC, a foreign corporation,
SHELLPOINT, LLC a foreign corporation, and
THE BANK OF NEW YORK AS TRUSTEE
FOR THE CERTIFICATEHOLDERS OF THE
CWABS, INC., ASSET-BACKED
CERTIFICATES, SERIES 2007-8, a national
association.

               Defendants.

CASE:

COMPLAINT
[JURY DEMAND]

        COME NOW, LARRY PIFER and PAMELA PIFER, husband and wife, hereinafter

"Plaintiffs," or "the Pifers" by and through the undersigned counsel, file this lawsuit seeking

quiet title and for judgment and damages resulting from the business practices of defendants

BANK OF AMERICA, N.A.; SPECIALIZED LOAN SERVICING LLC; SHELLPOINT, LLC

and THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF

THE CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-8, which are unfair

COMPLAINT                          1

1   and deceptive and which are designed to inflict the maximum injury and damages upon

2   homeowners such as the Pifers without just cause and without compliance with applicable laws.

3   <center>**PARTIES, JURISDICTION AND VENUE**</center>

4       1.    The Pifers are residents of Snohomish County, Washington, and record owner of

5   the real property located at 14313 214th Street SE, Snohomish WA 98296 ("the Property")

6   which is further described legally as:

7       Lot 4 of Survey recorded in Volume 24 of Surveys, page 273, under
    Recording Number 8705225013, being a portion of the southeast quarter of

8       Section 21, Township 27 north, Range 6 east, W M, in Snohomish County,
    Washington.

9   

10       2.    Defendant BANK OF AMERICA, N.A., and ("BANA") is a financial and

11   banking conglomerate which owns and/or services millions of residential loans on behalf of

12   other entities.  BANA headquarters in the State of North Carolina. It is unclear whether BANA

13   has an ownership interest in the mortgage loan that the Pifers took out in May of 2007 or were

14   simply a default servicer of the Pifer Loan between 2008 and 2013.

15       3.    Defendant SPECIALIZED LOAN SERVICING, LLC ("SLS") is a residential

16   mortgage servicing company based out of Colorado which has received a lot of consumer

17   complaints about harassing debt collection and sloppy foreclosure practices. SLS acted as the

18   servicer of the Loan between 2013 and 2017

19       4.    Defendant SHELLPOINT, LLC ("SHELLPOINT") is the present servicer of the

20   Loan. SHELLPOINT operates out of Greenville, South Carolina.

21       5.    Defendant THE BANK OF NEW YORK ("BONY"), is a national association

22   which is governed under the trust laws of the State of New York. BONY acts as Trustee for the

23   Certificateholders of CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-8.

24   

COMPLAINT             2

which purports to be the owner of the mortgage loan that the Pifers obtained in May 2007 ("the Loan") and which is secured by the Pifer residence as identified ("the Property") (Exhibit A, Deed of Trust).  BONY is responsible for the retention BANA, SLS and SHELLPOINT, as servicers of the Loan. BONY confers complete authority and discretion upon these defendants to service the Loan, to handle loss mitigation, and to refer the Loan to foreclosure.

6.      None of the defendants was involved with the Pifers when they obtained the Loan originally in 2007. None has explained how or provided complete proof of the transfer of the Loan from the original lender, Countrywide Home Loans, d/b/a America's Wholesale Lenders to the securitized trust. Yet, all four the defendants are participating in some or all aspects of debt collection and attempts to dispossess the Pifers from the Property as well as other real property secured by primary residences owned by other Washingtonians. All four defendants have conducted business within the borders of the State of Washington whereupon their business practices have harmed the Pifers and many others who are similarly situated.

7.      Defendants have used the mail, the telephone and the internet to reach across state lines into Washington to conduct their business. Defendants provide services and receive compensation for performance of these service but none of them have a direct stake in the ownership or a security interest in the collateral used to secure the mortgage loans they service. By having no skin in the game whatsoever, the defendants have not been willing to take the time to investigate or to otherwise address any concern that borrowers like the Pifers have about the mortgage loan or the foreclosure of their property.

8.      The Pifers seek damages against the defendants in the amount which exceeds $75,000.00. The parties are citizens of all different states. Therefore, the Court has jurisdiction based on complete diversity.

COMPLAINT                                    3

9.      Venue is proper in the United States District Court, Western District of Washington, Seattle, as the Pifers reside and the Property is located in Snohomish County, Washington.

## **FACTS**

10.      The Pifers borrowed money from Countrywide Home Loans, Inc., d/b/a America's Wholesale Lender in May of 2007 in the amount of $393,750.00. Unbeknownst to them, America's Wholesale Lender was not incorporated until more than a year later on December 16, 2008. Where the Pifer Loan Documents were executed under the d/b/a name, a d/b/a was not a legal entity and was incapable of entering into a contract with the Pifers (Exhibit B, Incorporation Information for America's Wholesale Lender). The original loan amount was $393,750.00, and the original interest was 7.600%. (Exhibit C, Note)

11.      In 2011, Bank of America, N.A., ("BANA") provided the Pifers with a Loan Modification Agreement to sign which states positively that BANA is the "Lender." The Loan Modification Agreement specifies that the principal amount is $434,710.30, and the "new interest rates" would increase in steps or 2% in years 1-2; 3% in year 4; 4% in year 5 and 4.875% in year 6. (Exhibit D, BANA Loan Modification Agreement).

12.      Despite the Pifers' full performance of the terms of the Loan Modification Agreement, including making payments in the amount specified for many months, BANA, as Lender, refused to return the fully executed Loan Modification Agreement. Instead, **BANA issued its Notice of Intent to Accelerate dated November 2, 2011** (Exhibit E, Notice of Intent to Accelerate). Having received the Notice of Intent to Accelerate, the Pifers believed they had no incentives at all to consider any other offer made by BANA.

13.      In 2012, an Assignment of Deed of Trust executed by Mortgage Electronic

COMPLAINT                                    4

Registration Systems, Inc., as nominee for the Lender, was recorded in the public records of Snohomish County. The Assignment of Deed of Trust purports to transfer the interests under both the Note and the Deed of Trust from MERS to "THE BANK OF NEW YORK MELLON, F/K/A THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-8." (Exhibit F, MERS Assignment of Deed of Trust).

14.     In January of 2013, BANA sent the Pifers correspondence informing that they have been determined ineligible for a loan modification because the Loan "was previously modified." BANA indicated further that "The Program does not allow more than one modification in 12 months or 2 modifications in a 5-year period." (Exhibit G, BANA Letter dated 1/15/13).

15.     Two months, later, in March of 2013, BANA sent the Pifers correspondence which states "Congratulations. We have determined that you are eligible for a trial modification." BANA baited the Pifers to make three payments starting April 1, 2013 in the amount of $1968.63, by promising, "we will contact you to discuss the terms of your permanent modification." This amount of the trial payments did not relate to the Loan Modification Agreement, and BANA did not acknowledge the payments that the Pifers made toward the Loan Modification Agreement in 2011 whatsoever (Exhibit H, BANA Letter dated 3/4/13).

16.     Within the span of a few weeks, and in contradiction to the first letter offering a trial modification, BANA also sent the Pifers another letter dated March 26, 2013, that reads, "Bank of America previously evaluated your loan for a modification and informed you by a letter dated 9/25/2012 that you were not eligible (Exhibit I, BANA letter dated 3/26/2013).

17.     Having made payments under the previous loan modification agreement, but not

B A R R A Z A   L A W   P L L C
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

the benefit of acknowledgement by BANA of the receipt of same, or the benefit of a fully executed contract, the Pifers were not able to know what their obligations were and what payment to make on monthly basis going forward.

18.     In late 2013, the servicing of the Loan was transferred to defendant SLS who began to issue monthly mortgage statements or periodic statements to the Pifers over the course of the next three to four years. The principal amount appearing on SLS' periodic statement was now $432,572.88 which is inexplicably less than the new principal stated on BANA's Loan Modification Agreement that the Pifers signed in 2011 of $434,710.30. Yet the statements show step interest rates of 3% and 4% (Exhibit J, Composite of Statements 2/01/14-7/1/15, 8/1/15-7/1/16).

19.     In August of 2016, SLS' statements began to show the interest increased to 4.875% without any notice or explanation to the Pifers for the increase; they could not figure out how SLS came up with the varying and increasing interest rates (Exhibit K, Composite of Statements 08/01/16-12/01/16).

20.     On January 22, 2016 the Pifers were notified by Tracey Shimek at Redmond General Insurance, their insurance broker for 20 years, that their home was under active foreclosure and force placement of insurance on the Pifer Property had occurred. Upon investigation, the Pifers learned that SLS sent their insurance carrier a letter informing that the Property was under foreclosure (Exhibit L, Notice to Insurance Carrier that foreclosure activity had started) while a Notice of Discontinuance of Trustee's Sale was recorded some three years prior on May 17, 2013 (Exhibit M Notice of Discontinuance of Trustee's Sale). By falsely reporting that the Property was under foreclosure, SLS sought to lessen the Pifers' standing with their insurance; it attempted to force-place insurance upon the Property for a much higher rate

COMPLAINT                                        6

**BARRAZA LAW PLLC**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

even though the Pifers were current in their payments for the insurance premium.

21.     It appears SLS was acting upon the information that in 2012, an Assignment of Deed of Trust executed by Mortgage Electronic Registration Systems, Inc., as nominee for the Lender, was recorded in the public records of Snohomish County. The Assignment of Deed of Trust purports to transfer the interests under both the Note and the Deed of Trust from MERS to "THE BANK OF NEW YORK MELLON, F/K/A THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2007-8." (Exhibit N, MERS Assignment of Deed of Trust). However, BANA did not inform the Pifers when this Assignment was recorded, and further did not respond to the Pifers' inquiry dated January 8, 2013, concerning the circumstances surrounding the execution and recording of the MERS Assignment.

22.     The Pifers continued to make inquiry to BANA as to the situation of the Loan on a continuing basis without the benefit of any truthful information. From the date of their signing of the 2011 Loan Modification Agreement and up until 2018, BANA has never produced a copy of the fully executed agreement or explained the status of said agreement.

23.     In late 2016, the Loan was transferred once again to a new servicer, defendant SHELLPOINT. SHELLPOINT issued to the Pifers **a Validating of Debt Notice dated December 8, 2016, identifying "The name of the creditor to whom the debt is owed is Bank of America, N.A**." (Exhibit O, Validation of Debt Notice).

24.     SHELLPOINT later issued another "Validation of Debt" dated January 18, 2017, identifying "**The current owner of this loan is BONY as trustee for CWABS 2007-8 GR1FIXC** and their mailing address is: 101 Barclay St., 8W New York, NY 10286." (Exhibit P, Validation of Debt 1/18/2017).

COMPLAINT                                             7

25.     SHELLPOINT has, since taking over the servicing of the Loan, issued a series of Periodic Statements to the Pifers. Starting in January of 2017, the statements issued by SHELLPOINT has the same New Principal Balance of $432,572.88, but the interest rate has stepped up to 4.875%. SHELLPOINT continues to impose default related fees, such as property inspection fees, late fees and accrued interests to the Loan without any explanation to the Pifers why the interest rate increased from 4% to 4.875% (Exhibit Q, Composite of Periodic Statements issued by SHELLPOINT in 2017 and 2018).

26.     In February of 2018, the Pifers inquired and SHELLPOINT responded SHELLPOINT informed the Pifers via letters that the "owner" of their Loan is "BONY as trustee for CWABS 2007-8 GR1FIXC" and provided the address for BONY as "101 Barclay St., 8W, New York, NY 10286." (Exhibit R, SHELLPOINT Letters dated 2/15/18 and 2/21/18). Nothing further was provided by BANA regarding the information it provided to SLS and SHELLPOINT. While the periodic statements issued by defendants SLS and SHELLPOINT, appear to represent the terms of the 2011 Loan Modification Agreement, BANA has gone out of its way to (1) decline the Pifers' request for loan modification after 2011 (2) offer the Pifers trial payments without specifying the terms of the permanent loan modification; (3) treat the Pifer Loan as a being in default and passing on such false information to co-defendants SLS and SHELLPOINT.

27.     SHELLPOINT sent the Pifers a package to apply for loan modification while simultaneously referring the Pifer Loan for foreclosure by its agent, North Star Trustee. This practice is known as "dual-tracking."

28.     None of the named defendants has ever explained to the Pifers that the Loan Modification Agreement is in fact valid and binding so that they could have made payments

COMPLAINT                                                      8

1   under the terms of the Agreement to prevent default and eventual loss of their home. Instead,

2   defendant BONY conferred authority and total discretion upon defendants BANA, SLS and

3   SHELLPOINT to do whatever they want with the Loan and the Pifers including inducement of

4   default and foreclosure. In fact, the defendants caused for a Notice of Trustee's Sale to be issued

5   and recorded on January 17, 2018, setting the auction sale date of May 18, 2018 (Exhibit S,

6   Notice of Trustee's Sale).

7                        **CAUSES OF ACTION**

8            29.     The Pifers expressly incorporate and incorporate by reference, each and all of the

9   foregoing factual allegations as enumerated in under the Facts Section, into each and all of their

10  Causes of Action below:

11                      **COUNT ONE: QUIET TITLE**

12           30.     A claim arising from a written contract must be brought within six years of the

13  date the cause of action accrues. RCW 4.16.005, 4.16.040.  The current nonjudicial foreclosure

14  of the Pifer home is based on the Deed of Trust that the Pifers executed in favor of the original

15  lender. The recovery sought by BONY and the defendants is on an obligation payable by

16  installments and each installment triggers the obligation payable by installments and the statute

17  of limitations runs against each installment from the time it becomes due. In this case, the last

18  payment was due prior to November 2, 2011. However, BANA, on behalf of the Lender,

19  unequivocally accelerated the debt via its Notice of Intent to Accelerate dated November 2,

20  2011, thereby triggering the six-year statute of limitations. Said statute of limitations expired on

21  November 2, 2017.  Where the defendants attempt to foreclose upon the Pifer home

22  nonjudicially by recording a Notice of Trustee's Sale on January 17, 2018, the foreclosure

23  action was time-barred and the Pifers are entitled to quiet title as against all defendants.

24

COMPLAINT                                    9

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1

## COUNT TWO: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT

31.     Defendant SHELLPOINT did not become the servicer of the Loan until the Loan had been declared to be in default by BANA and SLS. As such, SHELLPOINT is a debt servicer as it is servicing the default loan on behalf of BONY as defined under the FDCPA, 15 U.S.C 1692a (6). By commanding for its agent to initiate foreclosure and attempting to dispossess the Pifers from their homestead in January of 2018, SHELLPOINT violated §1692e because any legal right the lender has to do so has expired under the Statute of Limitations. The six-year period of statute of limitations was triggered by BANA's Notice of Intent to Accelerate dated November 2, 2011 and expired on November 2, 2017. RCW 4.16.040(1).  Suing or effectuating a proceeding for repossession or foreclosure on a time-barred debt is a practice uniformly held by courts to violate the FDCPA as a matter of law. Thus, SHELLPOINT's act of having its agent to record the Notice of Trustee's Sale on January 17, 2018, setting the auction sale date of May 18, 2018 violated the FDCPA.

## COUNT THREE: BREACH OF CONTRACT & BREACH OF GOOD FAITH AND FAIR DEALING

32.     Without waiving their claim of Quiet Title based on the expiration of the Statute of Limitations, in 2018, through the periodic statements issued by SLS and SHELLPOINT, , the Pifers finally discovered for the first time that the defendants were enforcing the terms of the Loan Modification Agreement that they signed, and under which they initially performed. Although they have received numerous correspondence from BANA, SLS and SHELLPOINT, , the defendants never communicated to the Pifers that the payments demanded were based on the terms of the Loan Modification Agreement. These included a new principal balance of $434,710.30, 2% interest in year 1-2, 3% in year 4 of the loan modification, 4% in year 5, and

COMPLAINT

10

4.875% for the remaining 25 years. BANA breached the Agreement by failing to clearly convey to the Pifers and the subsequent servicers that the Loan Modification Agreement was intact and that the payments due under the Agreement would be calculated based on the step increases from 2% to 4.875% in year 5 and for the remaining term of the Agreement.

33.     BANA breached the Loan Modification Agreement because it transferred the Loan to SLS on the pretense that the Loan was in default while BANA was in fact the defaulting party and not the Pifers. BANA's breach made it impossible for the Pifers to perform their end of the bargain. BANA had an affirmative duty to timely inform the Pifers that the Loan Modification Agreement did not require BANA's signature. In the alternative, if it is in fact BANA's policy not to provide borrowers with a fully executed loan modification agreement, BANA had a duty to inform the Pifers of its policy in a timely manner.

34.     BANA breached the Loan Modification Agreement because it transferred the servicing of the Loan to SLS based on the terms of the Loan Modification Agreement without informing the Pifers and without applying all payments that the Pifers had made previously.

## COUNT FOUR: NEGLIGENT MISREPRESENTATION-DEFENDANT BANA

35.     The law of torts provides that one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

36.     In this case, BANA is in the business of a loan servicer, it (1) supplied information for the guidance of others, including the Pifers, SLS and SHELLPOINT, regarding the Loan, which was false, (2) knew or should have known that the information was supplied to

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1   guide the Pifers in their mortgage loan and knew that the information supplied was false or

2   otherwise misleading,  (3) was negligent in obtaining or communicating the false information,

3   (4) the Pifers relied on the false information, (5) the Pifers' reliance was reasonable, and (6) the

4   false information proximately caused the Pifers damages.

5   37.    BANA knew that (1) the Pifers must rely upon BANA's representations

6   concerning who owns the Loan and how much the Pifers must pay to keep it current, (2) BANA

7   misled the Pifers into believing that there was a valid loan modification agreement upon which

8   they could begin to pay, (3) because BANA negligently failed to return a fully executed copy of

9   the Agreement to the Pifers, or negligently failed to explain to the Pifers it is not BANA's

10  policy to do so, (4) the Pifers rightfully relied on such omission or failure as an indication that

11  BANA did not honor the agreement, (5) the Pifers' suspension of payments in reliance of

12  BANA's representation was reasonable, and (6) BANA's representations about the Loan caused

13  the Pifers insecurity and forced them to suspend any further payments on the Loan, and (7)

14  BANA's subsequent misrepresentations about the Pifers' ineligibility for a loan modification

15  followed by BANA's misrepresentations that a trial modification was being offered to the Pifers

16  nonetheless, followed by BANA's misrepresentations that the Pifers' application for loan

17  modification was denied.

18  38.    By its negligent misrepresentations, BANA has caused the Pifers to default on

19  the Loan and subjected the Pifers to severe emotional distress including shame and

20  embarrassment over the induced default, fear and anguish over potential loss of their home, and

21  uncertainty over their future. BANA's negligent misrepresentations have caused Larry and

22  Pamela Pifer to succumb to severe stress and depression which manifested itself into other

23  physical symptoms, including unexplained stomach pain, nausea, headaches, insomnia, and loss

24

COMPLAINT                                     12

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

of appetite.  BANA's negligent misrepresentations have caused the Pifers to live under a constant state of uncertainty and deep worries; life has not been normal or enjoyable for the Pifers during the years that they have been haunted by foreclosure.

### COUNT FIVE: NEGLIGENT MISREPRESENTATION-DEFENDANT SLS

39.     Defendant SLS committed negligent misrepresentation by informing the Pifers' insurance carrier that the Property was under foreclosure which was not true.  On January 22, 2016, the Pifers were notified by Tracey Shimek at Redmond General Insurance, their insurance broker for 20 years, that their home was under active foreclosure and that force placement of insurance on the Pifer Property had occurred. SLS misrepresented to the Pifers' insurance carrier even though a Notice of Discontinuance of Trustee's Sale was recorded some three years prior on May 17, 2013. By falsely reporting that the Property was under foreclosure, SLS sought to lessen the Pifers' standing with their insurance and caused the Pifers pecuniary losses because the force-place insurance is much more expensive than the premium the Pifers were paying on their own.

40.     Defendant SLS committed negligent misrepresentation through the creating and mailing of the periodic statements to the Pifers in 2015 and 2016 without specifying the basis for its calculation of the amounts due and its demand for payment.  On a once-a-month basis, SLS negligently misrepresented the amount due and owing by the Pifers 24 times over the course of 2015 and 2016.

41.     Defendant SLS' negligent misrepresentations have caused the Pifers to be confused, frustrated and angry at the inability to get a handle on who they owe the money to and how much they have to pay. The Pifers suffer a general but acute distrust toward SLS who knew or should have known that borrowers such as the Pifers have no options but must rely on the

COMPLAINT

13

information produced by SLS to cure any default and to save their home from foreclosure.

42.     The tort of negligent misrepresentation requires that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

43.     Here, SLS is in the business of servicing residential loans upon which consumers like the Pifers must rely on information supplied by SLS to keep their loan current and prevent foreclosure. SLS knew that the Pifers as consumers have no choice but to rely upon information provided by SLS to conduct themselves. SLS was negligent in onboarding the Loan without confirming whether the terms were valid and enforceable by virtue of a fully executed contract between the Pifers as borrowers and the Lender. SLS was negligent in making demands upon the Pifers for payments based on step interest rates of 3% and 4% where the original promissory Note provides for a different interest rate. The Pifers relied upon the periodic statements issued by SLS to their detriment; they could not pay the amounts demanded by SLS because of the discrepancies between the original terms of the Loan and what are represented by SLS' periodic statements. SLS' negligent misrepresentations have caused the Loan to be in a chronic state of default and led to the impending foreclosure sale.

44.     As the relationship between the Pifers and SLS is one between borrower and servicer, and where SLS is not a party to the Loan documents whatsoever, the Pifers have no recourse against SLS based on contractual claims. However, because SLS undertakes to service the Loan and its servicing practices can mean the difference between a home saved and a home

**BARRAZA LAW PLLC**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

lost, its duty not to commit negligent misrepresentation arises independently and the breach of which allows for recovery in tort for economic losses.

45.     By its negligent misrepresentations, SLS has caused the Pifers to default on the Loan and subjected the Pifers to severe emotional distress including shame and embarrassment over the induced default, fear and anguish over potential loss of their home, and uncertainty over their future. SLS' negligent misrepresentations have caused Larry and Pamela Pifer to succumb to severe stress and depression which manifested itself into other physical symptoms, including unexplained stomach pain, nausea, headaches, insomnia, and loss of appetite.  SLS' negligent misrepresentations have caused the Pifers to live under a constant state of uncertainty and deep worries; life has not been normal or enjoyable for the Pifers during the years that they have been haunted by foreclosure.

## COUNT SIX: NEGLIGENT MISREPRESENTATION
## DEFENDANT SHELLPOINT, LLC

46.     Defendant SHELLPOINT committed negligent misrepresentation when it issued the Validation of Debt Notice to the Pifers declaring that defendant BANA is the owner of the Loan or that the Pifers owe the debt to BANA in December of 2016, and then to followed it up with a response to the Pifers' QWR in January 2017 declaring that the owner of the Loan is in fact BONY. Upon information, there is no proof that defendant BANA or defendant BONY actually "owns" the Loan.

47.     Defendant SHELLPOINT committed negligent misrepresentation through the creation and mailing of the periodic statements to the Pifers in 2017 and 2018 without specifying the basis for its calculation of the amounts due and its demand for payment.  On a once-a-month basis, SHELLPOINT negligently misrepresented the amount due and owing by the Pifers 13 or more times over the course of 2017 and 2018. In this case, SHELLPOINT is in

COMPLAINT                                         15

1  the business of servicing residential loans upon which consumers like the Pifers must rely on

2  information supplied by SHELLPOINT to keep their loan current and prevent foreclosure.

3  SHELLPOINT knew that the Pifers as consumers have no choice but to rely upon information

4  provided by SHELLPOINT through correspondence and periodic statements to conduct

5  themselves.

6       48.    SHELLPOINT was negligent in onboarding the Loan without confirming

7  whether the terms were valid and enforceable by virtue of a fully executed contract between the

8  Pifers and the Lender. SHELLPOINT was negligent in making demands upon the Pifers for

9  payments based on step interest rates of 4% and 4.875% where the original promissory Note

10  provides for a different interest rate. The Pifers relied upon the periodic statements issued by

11  SHELLPOINT to their detriment as they could not pay the amounts demanded by

12  SHELLPOINT because of the discrepancies between the original terms of the Loan and what

13  are represented by SHELLPOINT's periodic statements. SHELLPOINT's negligent

14  misrepresentations have caused the Loan to be in a chronic state of default and led to the

15  impending foreclosure sale.

16       49.    As the relationship between the Pifers and SHELLPOINT is one between

17  borrower and servicer, and where SHELLPOINT is not a party to the Loan documents, the

18  Pifers cannot hold SHELLPOINT accountable based on any contractual term including those

19  specified by the Note and Deed of Trust. However, because SHELLPOINT undertakes to

20  service the Loan and its servicing practices does mean the difference between a home saved and

21  a home lost, its duty not to commit negligent misrepresentation arises independently and the

22  breach of which allows for recovery in tort for the Pifers' losses.

23       50.    Defendant SHELLPOINT's negligent misrepresentations have caused the Pifers

24

COMPLAINT               16

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

to be confused, frustrated and angry at the inability to get a handle on who they owe the money to and how much they have to pay. The Pifers suffer a general but acute distrust toward SHELLPOINT who knew or should have known that borrowers such as the Pifers have no options but must rely on the information produced by SHELLPOINT to cure any default and to save their home from foreclosure.

51.     By its negligent misrepresentations, SHELLPOINT has caused the Pifers to default on the Loan and subjected the Pifers to severe emotional distress including shame and embarrassment over the induced default, fear and anguish over potential loss of their home, and uncertainty over their future. SHELLPOINT's negligent misrepresentations have caused Larry and Pamela Pifer to succumb to severe stress and depression which manifested itself into other physical symptoms, including unexplained stomach pain, nausea, headaches, insomnia, and loss of appetite.  SHELLPOINT's negligent misrepresentations have caused the Pifers to live under a constant state of uncertainty and deep worries; life has not been normal or enjoyable for the Pifers during the years that they have been haunted by foreclosure.

## COUNT SEVEN: VIOLATION OF THE CONSUMER PROTECTION ACT; ALL DEFENDANTS

52.     The defendants have violated the Washington Consumer Protection Act ("CPA") as to each of the five elements: they have committed one or more (1) unfair or deceptive act or practice; (2) in trade or commerce; (3) that has an impact on the public interest; (4) resulted in injury in the Pifers in their business or property; and (5) the injury and damages suffered were proximately caused by the defendants.

53.     The business of default loan servicing with includes nonjudicial foreclosure has been adjudicated by Washington courts to be occurring in commerce and impacting an

COMPLAINT                                          17

BARRAZA LAW PLLC
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

important public interest. The defendants use the internet to advertise and to communicate with borrowers from their locations which are outside of the State of Washington. They use the mail, the telephone and the internet to transmit notice of intent to accelerate, periodic statements, notice of default, debt validation, notice of trustee's sale, and other correspondence to borrowers including the Pifers; they receive substantial compensation for their services and part of their compensation comes directly from payments made by borrowers. Thus, the defendants' business activities are carried out in trade or commerce.

54.    The defendants knew or should have known that the debt they are trying to collect and the collateral they are trying to foreclose upon is time-barred. As lender and servicers, the defendants are charged with actual knowledge that where the Pifers made their last payment in September of 2011, and where BANA issued the Notice of Intent to Accelerate dated November 2, 2011, the lender had only six years from the date of the Notice of Intent to Accelerate to foreclose on the Property as collateral of the mortgage loan.

55.    Where the six-year period of statute of limitations expired on November 2, 2017, the Notice of Trustee's Sale recorded on January 17, 2018, setting the auction sale date of May 18, 2018, was issued after the statute of limitations had expired and is not effective to foreclose on the Pifer residence.

56.    The defendants' action of foreclosing on the Pifer residence based on the terms of the Deed of Trust after the statute of limitations expired is unfair. The defendants' act of transmitting various foreclosure documents and correspondence to the Pifers for debt collection purposes (compelling payment to cure) and for foreclosure purposes is deceptive because the lender's legal right to foreclose on the collateral has been limited or eliminated by the statute of limitations.

**BARRAZA LAW PLLC**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

57.     The defendants are charged with knowing about the inconsistency between BANA's assertion of ownership of the Loan, and the competing claim asserted by the Bank of New York Mellon as the purported beneficiary under the Deed of Trust. There exists a great doubt about who is the proper beneficiary to appoint the defendants to be trustee for purposes of the nonjudicial foreclosure. The defendants' failure to acknowledge the inconsistency regarding ownership of the Loan and beneficiary status before commencing nonjudicial foreclosure materially violated the Deed of Trust Act, which serves as the basis for the Pifers' claims under the CPA.

58.     The defendants knew or should have known that the Assignments of Deed of Trust and Appointments of Successor Trustee have been infected by robo-signing and that the documents might be structurally invalid and because they were purportedly executed under certain and specific powers of attorney, but such powers of attorney have not been recorded or otherwise verified. The defendants' failure to investigate and verify the circumstances underlying the Assignments of Deed of Trust and Appointment of Successor Trustee violates the CPA.

59.     The defendants acted unfair and deceptively by "dual-tracking" the Pifer Loan, which is to engage the Pifers in loss mitigation while simultaneously referring them to foreclosure.

60.     The defendants' collective failure to clearly explain to the Pifers the terms stated in the periodic statements over the course of 2015, 2016, 2017 and 2018 so to enable the Pifers to cure or to exercise certain loss mitigation options is both unfair and deceptive. The defendants' failure has proximately caused tremendous damages to the Pifers including accrued interests, late fees, default-related and foreclosure-related fees, and diminution of valuation of

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

their Property to the extent that it would be lost due to wrongful foreclosure. The Pifers have

suffered an enormous loss of time and resources in their efforts to contact the loan servicers, the

purported loan owner, and other governmental agencies to get answers to their questions

regarding the Loan and the Foreclosure. The time spent, and resources expended by the Pifers

are time that they could work and earn an income, or enjoy their life. These establish the injury

element of a private action by the Pifers against the defendants under the Consumer Protection

Act.

61.     The defendants' individual and collective conduct have directly and proximately

caused the Pifers to suffer injury and actual damages. In addition to having paid approximately

$10,000 in attorney fees to determine who they owe and how much to pay, the Pifers also have

lost approximately $5,000 in time spent and out-of-pocket expenses relating to correspondence

made to the defendants concerning the servicing of their loan. In addition to the enumerated

injury and damages, the Pifers would lose their home through a trustee's sale and suffer the

complete loss of its value, which is approximately $500,000, even though the lender's right to

foreclose has been extinguished by the statute of limitations.

## **PRAYER FOR RELIEF & DAMAGES**

Having stated their allegations and claims, LARRY PIFER and PAMELA PIFER, pray

the Court for the following relief:

1.     For declaratory relief and judgment that the Debt is time-barred;

2.     For an injunction barring the defendants from selling the Property at auction;

3.     For damages flowing from breach of contract and breach of good faith and fair

dealing;

4.     For damages provided under the Fair Debt Collection Practices Act;

COMPLAINT

20

**BARRAZA LAW PLLC**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

5.      For an award of injury and actual damages suffered, and treble damages and attorney fees and costs under the Washington Consumer Protection Act;

6.      For all tort damages recoverable under negligent misrepresentation, including emotional distress;

7.      For prejudgment interests;

8.      For other additional relief the Court deems just and equitable.

DATED this 25th day of April, 2018.

BARRAZA LAW, PLLC

*/s/ V. Omar Barraza*

VICENTE OMAR BARRAZA, WSBA 43589
Counsel for Plaintiff
14245-F Ambaum Blvd SW, Seattle WA 98166
206-933-7861 Fax 206-933-7863

COMPLAINT

21